**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

BEVERLY FRANTINO MAJKUT,

        Plaintiff,

vs.                           Case No. 8:07-cv-1828-T-MCR

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,

        Defendant.

_____/

**MEMORANDUM OPINION AND ORDER[1]**

This cause is before the Court on Plaintiff's appeal of an administrative decision denying her application for Social Security benefits. The Court has reviewed the record, the briefs and the applicable law. For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.    .

**I.    PROCEDURAL HISTORY**

Plaintiff filed her application for Social Security Insurance ("SSI") and Disability Insurance Benefits ("DIB") on September 17, 2001. (Tr. 22-25). Plaintiff's application was denied initially and upon reconsideration. (Tr. 19). Following an administrative hearing on February 4, 2003, the ALJ denied benefits to Plaintiff in a decision dated March 19, 2003. (Doc. 16, p. 1). The Appeals Council granted Plaintiff's request for review and remanded Plaintiff's claim for further proceedings. (Doc. 16, p. 2). A second hearing was held May 13, 2004, and the ALJ denied Plaintiff's claim in a decision dated July 16, 2004. (Doc. 15, p. 2). The Appeals Council granted review of

_____

[1] The Parties consented to a United States Magistrate Judge exercising jurisdiction.

Plaintiff's claim and for a second time remanded the matter for further proceedings. (Doc. 16, p. 2). After a hearing on March 28, 2006, and a supplemental hearing on May 4, 2006, the ALJ denied benefits to Plaintiff in a decision dated July 28, 2006. (Tr. 19-44). The Appeals Council denied review, making the ALJ's July 28, 2006 decision the final decision of the Commissioner. (Tr. 8-10). Plaintiff timely filed a Complaint in this Court. (Doc. 1).

## II.  NATURE OF DISABILITY CLAIM

### A.  Basis of Claimed Disability

Plaintiff claims to be disabled since August 1, 1999, due to degenerative disc disease ("DDD") of the cervical spine, fibromyalgia, carpel tunnel syndrome ("CTS"), and depression. (Tr. 22-25).

### B.  Summary of Evidence Before the ALJ

At the time of the final hearing on May 4, 2006, Plaintiff was 52 years old and had a tenth grade education. (Tr. 868, 886). Her past work experience included work as a secretary, an office manager, a book keeper, and a nurse's aid. (Tr. 870-71, 926-31). Plaintiff also worked briefly as a telemarketer after the alleged onset of disability, but the ALJ found this was not substantial gainful activity. (Tr. 22).

#### 1.  Medical Evidence

Plaintiff was injured on August 25, 1999, while working as a nurse's aid and attempting to move a patient under her care. (Tr. 354). Plaintiff presented at a walk-in clinic on September 8, 1999, complaining of restricted movements and pain in her left shoulder. (Tr. 297). The x-ray of Plaintiff's left shoulder revealed no acute changes. (Tr.

298).  Dr. G.S. Dhaliwal prescribed Motrin and advised rest for one week.  Id. Plaintiff

declined a cortisone shot for possible bursitis of the shoulder.  Id.  Plaintiff saw Dr.

Dhaliwal again on September 15, 1999.  (Tr. 296).  He changed Plaintiff's medication to

Cataflan, referred Plaintiff to an orthopedic doctor, and released Plaintiff to light duty

work, involving only her right arm.  (Tr. 295-296).

Steven C. Mirabello, M.D. and John H. Shim, M.D. of Florida Sports &

Orthopaedic Medicine, treated Plaintiff from September 20 through December 20, 1999.

Dr. Mirabello's notes indicate Plaintiff had no muscle atrophy or pain with flexion or

extension of the cervical spine.  (Tr. 301).  Dr. Mirabello recommended Plaintiff see a

physiatrist[2] and be kept on light duty.  Id.  Dr. Mirabello also advised physical therapy.

Id.  On October 13, 1999, Plaintiff presented to Daniel H. Bender, M.D., a physiatrist at

the Spine & Pain Medical Center.  (Tr.  323).  Dr. Bender's physical examination of

Plaintiff revealed decreased pinprick in the C7 dermatome and hyperesthesias in the left

C6 and C8 dermatome, normal left shoulder ROM with creptius, and mild impingement

sign.  Id.  Dr. Bender also noted trigger points and spasms in the left trapezius and

tenderness at the left AC joint rotator cuff tendon.  Id.  When Dr. Bender saw Plaintiff on

November 15, 1999, after Plaintiff had completed one month of physical therapy, Plaintiff

continued to complain of left upper extremity radicular pain in a C7 distribution. (Tr. 321).

Dr. Bender recommended a cervical spine MRI, electrodiagnostic studies, and a surgical

consultation.  Id.  Plaintiff's MRI, performed November 17, 1999, revealed left C6-7 disc

herniation with a C7 impingement.  (Tr. 318).  On December 16, 1999, a complete

_____

[2]Physiatrists are experts at diagnosing and treating pain who specialize in restoring
function lost through injury.

electrodiagnostic study was performed, the results of which indicated an acute left C7 radiculopathy. (Tr. 314). On December 20, 1999, Plaintiff attended a surgical consultation with Dr. Shim, who recommended anterior cervical discectomy and fusion with instrumentation with allografting ("ACDF"). (Tr. 300).

Craig A. Schwartz, M.D., an orthopedist, began treating Plaintiff on February 29, 2000. Dr. Schwartz noted normal strength and sensation in Plaintiff's upper right and lower extremities. (Tr. 355). He found mild reduction in strength in Plaintiff's left upper extremity. Id. Plaintiff's cervical range of motion was decreased in lateral rotation to the left and there was negative impingement sign in the left upper extremity. Id. Dr. Schwartz also determined Plaintiff had left neck and arm pain, along with left arm tingling which was secondary to left C7 radiculitis. Id. Dr. Schwartz prescribed Vioxx and released Plaintiff to light duty work with no lifting over 10 lbs., limited overhead activities with left arm, and no repetitive use of left shoulder. Id. When Plaintiff saw Dr. Schwartz on June 6, 2000, she reported working 20-25 hours per week at a computer, but stated it bothered her symptoms. (Tr. 353). Dr. Schwartz determined Plaintiff had reached maximum medical improvement because she was unwilling to undergo surgical intervention. Id. He gave Plaintiff an impairment rating of 13% based on the C7 radiculopathy and C6-C7 disc herniation, and released her to light duty work with no lifting greater than 5 lbs. with left arm, no repetitive activity of left arm, and limited overhead activity. Id.

On July 25, 2000, Dr. Schwartz found decreased range of motion in Plaintiff's cervical spine, but her strength in all four extremities was within normal limits. (Tr. 351). Dr. Schwartz noted chronic neck pain and left arm pain, secondary to C7 radiculopathy,

and underlying C6-7 disc herniation.  Id.  Nevertheless, Dr. Schwartz released Plaintiff to light duty work.  Id.  On December 12, 2000, Dr. Schwartz noted Plaintiff's sensation, strength, and deep tendon reflexes were within normal limits in all extremities.  (Tr. 348).  Plaintiff complained of a two month history of achiness, intermittent numbness, and tingling in her right arm, but denied any new injury.  Id.  Plaintiff did not report any significant neck pain at that time, but she said she still had occasional left arm achiness, numbness, and tingling.  Id.  Dr. Schwartz indicated he wanted to obtain a second cervical MRI to see if there was any change that might account for Plaintiff's right sided symptoms.  Id.

Plaintiff's second cervical MRI was performed on May 7, 2001.  (Tr. 308).  The MRI showed mild disc degeneration at C2-3, C3-4, C4-5, and C5-6, without disc bulge, herniation, spinal stenosis, or foraminal impingement.  (Tr. 308).  At C6-7, there was again evidence of degenerative disc changes and left posterolateral disc herniation, causing moderate left lateral recess and left C6-7 foraminal encroachment.  Id.  Plaintiff saw Dr. Schwartz again on July 9, 2001, at which time Dr. Schwartz indicated the MRI findings were stable since the prior study.  (Tr. 342).  Plaintiff told Dr. Schwartz she had not been working, however, he said she could continue working light duty and increased the weight Plaintiff was able to lift from 5 lbs. to 10 lbs.  Id.  He also indicated he wanted to obtain a Functional Capacity Evaluation.  Id.

On September 10, 2001, a Functional Capacity Evaluation[3] was performed by a

_____

[3]Physical Residual Functioning Capacity assessments were also performed by state agency personnel on April 12, 2001 (Tr. 396), November 2, 2001 (Tr. 384), March 25, 2002 (Tr. 375-378), and April 30, 2002 (Tr. 471).  All except one evaluator found Plaintiff had some exertional, manipulative, and postural limitations.  However, each evaluator determined Plaintiff

physical therapist at Healthsouth.  (Tr. 326).  The results of the evaluation indicated

Plaintiff was able to work at a light level.  Id.  During the evaluation, Plaintiff's heart rate

remained between 74 and 77 despite her reports of "excruciating pain," which was

considered inconsistent with the expected 10 bpm physiological increase.  (Tr. 327).

Plaintiff returned to Dr. Schwartz on January 17, 2002, when he again determined

Plaintiff had reached maximum medical improvement because Plaintiff continued to

refuse surgical intervention.  (Tr. 339).  However, Dr. Schwartz reduced Plaintiff's

impairment rating from 13% to 5% after finding mildly decreased cervical range of motion

in all ranges and some left trapezius discomfort to palpation.  Id.  Dr. Schwartz also

noted questionable mildly decreased sensation in the left third finger, strength within

normal limits in all four extremities, and normal deep tendon reflexes in both upper and

lower extremities.  (Tr. 339).  When Plaintiff presented to Dr. Schwartz on July 9, 2002,

he determined there was no change in Plaintiff's prognosis.  (Tr. 472).  However, Dr.

Schwartz noted possible bilateral CTS, unrelated to left shoulder injury, and possible

fibromyalgia/myofacial pain syndrome, likely brought on by the injury to Plaintiff's left

shoulder.  (Tr. 472).

Dr. Gary Levine treated Plaintiff beginning on April 30, 2002.[4]  On April 30, 2002,

Dr. Levine completed a Physical Residual Capacity ("physical RFC") assessment form in

which he indicated Plaintiff could occasionally and frequently lift less than 10 lbs., stand

_____

could perform light work.

[4]The Court notes a letter dated June 23, 2005, states Plaintiff was seeing Dr. Levine
since January 21, 2003.  (Tr. 725).  The Court assumes this was a clerical error because there
are records which indicate Dr. Levine treated Plaintiff since April 30, 2002.  (Tr. 464).

and/or walk with normal breaks less than 2 hours in an 8-hour workday, and sit, with normal breaks, for a total of less than 6 hours in an 8-hour workday. (Tr. 464). Dr. Levine indicated Plaintiff was limited in all four extremities. He found Plaintiff could never climb, but could occasionally balance, stoop, kneel, crouch, and crawl. Plaintiff was limited in her ability to reach, handle, finger, and feel and she was encouraged to avoid moderate exposure to cold and vibration, and concentrated exposure to extreme heat, wetness, humidity, noise, and fumes. (Tr. 468). On May 7, 2002, Dr. Levine prescribed Zanaflex and Zoloft. (Tr. 430). On December 23, 2002, Plaintiff reported bilateral leg cramps, severe stress, and depression and Dr. Levine prescribed Klonopin. (Tr. 407, 410). On February 25, 2003, Plaintiff complained of depression, crying, and anxiety, and Dr. Levine increased her dosage of Zoloft. (Tr. 530). Throughout his records, Dr. Levine ordered several tests, added diagnoses, and varied prescription medications. However, there is no indication that Dr. Levine, at anytime, increased Plaintiff's physical or mental limitations. In a letter dated June 23, 2005, Dr. Levine opined Plaintiff "[was] unable to work due to numerous health problems." (Tr. 725). On March 6, 2006, Dr. Levine signed a statement indicating Plaintiff's physical limitations had remained the same from April 2002. (Tr. 783). On March 20, 2006, Dr. Levine completed a Mental Residual Functioning Capacity ("mental RFC") Assessment in which he opined Plaintiff had significant signs and symptoms of depression, increasingly worse panic attacks, and anxiety. (Tr. 786). He indicated Plaintiff had problems with short term memory loss, was unable to stay on task, focus, and concentrate. Id. He stated Plaintiff had chronic pain syndrome, fibromyalgia, and disc herniation and had a difficult time coping with the day to day activities of living. Id.

On February 1, 2002, Plaintiff underwent a psychological examination with Steven Kanakis, Psy.D. at the request of the Division of Disability Determinations. Plaintiff reported mild depression since the onset of her pain in 1999. (Tr. 359). Plaintiff explained she had taken Paxil for a short while, but stopped using it because she could not tolerate the side effects. Id. Dr. Kanakis noted Plaintiff displayed a few signs of distress, mainly tearfulness, during the clinical interview. Id. Dr. Kanakis diagnosed Plaintiff with dysthemic disorder and did not believe Plaintiff was at risk of suffering decompensation in a work-like setting. Id. Dr. Kanakis recommended trying a new antidepressant and/or outpatient psychotherapy. Id. Judith LaMarche, Ph.D., a non-examining source, completed a Psychiatric Review Technique form on March 20, 2002, in which she also indicated Plaintiff had dysthymic disorder. She opined Plaintiff had no significant mental limitation and was able to function consistent with work related activities. (Tr. 373).

Plaintiff's attorney referred her to Robert R. Dies, Ph.D. for an evaluation on February 21, 2002. The initial documentation presented to Plaintiff indicated the goal of the psychotherapy sessions was to gather information to support her application for disability benefits. (Tr. 475). In the initial paperwork, Plaintiff was also asked to choose whether she wanted to have the cost of the evaluation deducted from any money awarded by the Social Security Administration. Id. Dr. Dies determined Plaintiff suffered from a chronic and insidious mood disorder related to her unrelenting battles with agony and physical restrictions. (Tr. 463). He diagnosed Plaintiff with Mood Disorder (DSM-IV 293.83). Dr. Dies opined Plaintiff's medical and psychological problems were individually and jointly disabling and therefore, made gainful employment impossible. Id. Dr. Dies

advised Plaintiff to seek psychological treatment to help her cope with everyday responsibilities and Plaintiff agreed to enter a disability support group. Id.

Plaintiff's primary care physician, Dr. Levine, referred her to a neurologist, Larry W. Horton, M.D., on May 14, 2003. (Tr. 499). Plaintiff complained of discomfort from head to toe, leg cramps, and numbness in her hands. (Tr. 499). Dr. Horton found no evidence of atrophy and noted Plaintiff exhibited some mild underlying anxiety upon questioning. (Tr. 544). Plaintiff's final visit to Dr. Horton was on November 20, 2003. (Tr. 542). At that visit, he noted Plaintiff had early CTS, but there was no evidence of EMG abnormality. Id. The exam revealed Plaintiff's strength was preserved in her upper and lower extremities, her reflexes were normal, and her peripheral neuropathy was mild. Id. Dr. Horton indicated Plaintiff's presentation was most consistent with fibromyalgic syndrome. Id.

Riqueza G. Cua MD., Plaintiff's treating psychiatrist, saw Plaintiff from October 15, 2003 through February 2, 2004. (Tr. 579 - 683). Dr. Cua completed a mental RFC assessment on October 15, 2003, in which she noted signs and symptoms of depression, worsening panic attacks, inability to focus and concentrate, and difficulty coping with daily activities. (Tr. 551). On October 31, 2003, Dr. Cua diagnosed major depressive disorder without psychotic features, dysthymic disorder late onset with atypical features, and panic disorder without agoraphobia. Dr. Cua gave Plaintiff a GAF score of 45, increased Plaintiff's dosage of Zoloft to 100mg, and determined Plaintiff was unable to work. (Tr. 581). Dr. Cua's progress notes dated December 1, 2003, indicate Plaintiff remained frustrated and was having frequent migraines. (Tr. 582). Plaintiff's mood was sad and her affect flat. Id. Again, Dr. Cua gave Plaintiff a GAF score of 45.

(Tr. 579).  On January 5, 2004, Dr. Cua's diagnosis was more or less the same as before, except Plaintiff's GAF score was increased to 50.  (Tr. 579).   When Plaintiff saw Dr. Cua on July 26, 2005, she admitted to passive death wishes.  (Tr. 727).  Dr. Cua noted Plaintiff's mood was sad, her affect was flat, and she was tearful.  Id.  Her GAF remained at 50.  Id.  On August 24, 2005, Plaintiff reported her husband was declaring bankruptcy, and  Dr. Cua noted Plaintiff had not been taking her medication because she could not afford it.  (Tr. 726).

Don DelBeato, Ph.D., state consultative psychologist, administered a personality evaluation and completed a work related activity form for Plaintiff on February 18, 2004.  Dr. DelBeato reported Plaintiff exhibited irritability with a "chip on her shoulder" type attitude and was somewhat dramatic in presentation.  (Tr. 585).  Dr. DelBeato administered the Minnesota Multiphasic Personality Inventory ("MMPI-2") but determined the results were probably invalid.  Id.  Dr. DelBeato found the lie scale and the faking bad scale were elevated and opined Plaintiff was presenting herself as quite ill and embellishing her symptoms.  Id.  He reported Plaintiff seemed obsessed with her symptoms and he thought it was possible that psychological factors and narcissistic personality features were affecting Plaintiff's physical condition.  Id.  Nevertheless, Dr. DelBeato gave Plaintiff a GAF score of 50-55.  (Tr. 585).  Dr. DelBeato completed a Medical Assessment of Ability to do Work Related Activities (mental) and reported Plaintiff had a fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, maintain attention/concentration, and interact with supervisors.  (Tr. 589).  However, he indicated a poor ability to deal with work stress and function independently.  Id.   In terms of making performance adjustments, he found Plaintiff had a good ability to

understand, remember and carry out simple job instructions. (Tr 590). Dr. Delbeato found Plaintiff had a poor ability to demonstrate reliability. (Tr. 590). Dr. DelBeato's prognosis for Plaintiff was guarded to poor for rehabilitation. (Tr. 586).

Dr. Horton ordered another MRI of Plaintiff's cervical spine which was performed on January 20, 2004. (Tr. 565). Dr. Levine then referred Plaintiff to Thomas Freeman, M.D., a neurosurgeon, who examined Plaintiff on March 15, 2004. (Tr. 616). Dr. Freeman indicated the results of Plaintiff's MRI were the same as the previous ones, but noted there was progression of the end plate changes. (Tr. 617). Dr. Freeman observed Plaintiff was in moderate distress with mild pain behaviors. Id. He noted Plaintiff's ROM of her neck was only 5 degrees to the right and 10 degrees to the left. However, Dr. Freeman observed Plaintiff could rotate her neck 45 degrees to either side when distracted. Id. Strength in Plaintiff's arms was mildly decreased and Dr. Freeman noted overlying fibromyalgia from chronic disuse of her arm and chronic/burning pain that was likely permanent. Id. Dr. Freeman also determined Plaintiff had permanent nerve damage that was quite extensive and he was unsure surgery would help so far along in the process. Id.

Dr. Levine also referred Plaintiff to Maria Christina Soto-Aguilar, M.D., a rheumatologist. (Tr. 775). Dr. Soto-Aguilar's initial evaluation was performed on August 29, 2005. (Tr. 772). She noted moderate to severe fibromyalgia, intervertebral cervical disc disease, post traumatic since 1999, possible cervical radiculitis, bilateral CTS, restless leg syndrome, and sleep disorder. (Tr. 771). Dr. Soto-Aguilar also observed Plaintiff had a slow, stiff, antalgic gait, and her mood was depressed. (Tr. 774). Dr. Soto-Aguilar's notes dated November 22, 2005, indicate Plaintiff was driving her

husband to and from work four days per week at that time. (Tr. 770). Dr. Soto-Aguilar's physical examination of Plaintiff revealed 17 trigger points of fibromyalgia with muscle spasms, and clicking and tenderness in Plaintiff's joints. (Tr. 770). Nevertheless, Dr. Soto-Aguilar did not restrict Plaintiff's activity. Dr. Soto-Aguilar encouraged Plaintiff to do low impact exercises and swimming in warm water, recommended wrist splints, and added Darvocet, to be taken as needed. (Tr. 771).

## 2. Other Evidence

In this case, hearings were held on February 4, 2003[5] (Tr. 806 - 829), May 13, 2004 (Tr. 830 - 861), March 28, 2006 (Tr. 862 - 885), and May 4, 2006 (Tr. 886 - 934). When Plaintiff arrived for her initial hearing on February 4, 2003, Plaintiff stated she was unable to ride the elevator to the 4th floor due to panic attacks and Plaintiff took the stairs instead. (Tr. 476). Plaintiff's testimony at each hearing was essentially the same. However, the details of the May 4, 2006 hearing are summarized below. Plaintiff was married in 2003, had no children, and last worked from March 2000 to May 2000 as a telemarketer. (Tr. 871). Plaintiff testified she suffered from fibromyalgia, restless leg syndrome, migraines, generalized joint pain, and depression. (Tr. 892). Plaintiff stated she had frequent migraines at a level 10, for which she would take hot showers and have to lie down in a dark room. (Tr. 873). She testified to level 9 neck pain which radiated through her shoulders and hands. Id. Although Plaintiff had been offered surgery, she refused it because she feared the outcome. Id. Plaintiff indicated her husband did the

_____

[5]The ALJ noted the hearing monitor's observation that Plaintiff sat quietly and waited in the hearing room, but began to exhibit pain behaviors of walking bent over and crying, only after her representative showed up. (Tr. 26). There is no written evidence of the hearing monitor's observation in the record.

12

household chores, the cooking, the laundry, and the groceries. (Tr. 892). Plaintiff stated her husband helped her with peripheral care, including bathing, grooming, and dressing. (Tr. 896). Plaintiff testified to sleep interference 2-3 times per night (Tr. 893), panic attacks (Tr. 892), feelings of worthlessness and crying (Tr. 894, 895), and medication side effects, such a nausea, diarrhea, and problems with memory/concentration. (Tr. 898). Plaintiff stated she could stand or walk about five minutes before she had problems, and she could sit about five minutes before she had pain or problems. (Tr. 900). As a result, Plaintiff testified she spent six to eight hours per day reclining. (Tr. 898). Additionally, Plaintiff indicated she dropped things three to four times per day. (Tr. 900). Plaintiff's attorney proffered the testimony of her husband, which essentially reiterated the details Plaintiff testified to. (Tr. 900-902).

Medical Expert, David B. Kazar, Ph.D. testified at the May 4, 2006 hearing. Based on his review of the exhibits, Dr. Kazar identified the presence of major depression, which was described as recurrent and severe without psychotic symptoms, panic disorder, and dysthymia. (Tr. 906 - 907). Dr. Kazar recognized evidence of depression throughout the record. (Tr. 919). Dr. Kazar indicated Plaintiff's elevated scores on the lie scale of the MMPI-2 suggested Plaintiff may have been exaggerating her symptoms somewhat, however, he stated the degree of symptom exaggeration was not so great as to invalidate Plaintiff's profile. (Tr. 909). Dr. Kazar discredited the records of Dr. Dies because of the fact that Dr. Dies appeared to be taking a contingent fee for his services. (Tr. 911). Further, Dr. Kazar indicated a person with a GAF score ranging from 45 to 50 would likely have trouble holding a regular job, maintaining stability, and functioning in social and other day to day activities. (Tr. 915).

On May 4, 2006, the ALJ also heard the testimony of a Vocational Expert, Dr. Irvin J. Roth. (Tr. 925). Dr. Roth indicated Plaintiff could not do any of her past work. (Tr. 931). Based on Plaintiff's physical RFC for light work with frequent limitation for reaching above shoulder height and performing tasks requiring constant, repetitive pushing and pulling, and an occasional limitation for concentrating on assigned tasks and coping with work stress, Dr. Roth opined Plaintiff could perform unskilled, sedentary jobs such as usher, ticket taker, or fast food worker. (Tr. 932). When the ALJ added the physical restrictions of Plaintiff's treating physician, Dr. Levine, Dr. Roth opined Plaintiff would be unable to do any substantial gainful activity. (Tr. 932). Further, when the ALJ added the limitations of Plaintiff's treating psychiatrist, Dr. Cua, Dr. Roth opined Plaintiff would not be able to do any work. (Tr. 933).

## C.  Summary of the ALJ's Decision

A plaintiff is entitled to disability benefits when she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than 12 months. 42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505. The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 29 C.F.R. § 404.1520(b), 416.920(a)(4)(I). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c), 416.920(a)(4)(ii). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d), 416.920(a)(4)(iii). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e), 416.920(a)(4)(iv). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f), 416.920(a)(4)(v). Plaintiff bears the burden of persuasion through step four, while at step five, the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287 n.5 (1987).

In this case, the ALJ determined Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability.[6] (Tr. 21). Second, while Plaintiff's ailments, including DDD of the cervical spine, fibromyalgia, CTS, and depression, were "severe," the ALJ determined that they did not meet or medically equal a listed impairment.[7] (Tr. 22-25). Third, the ALJ determined Plaintiff had the residual functional capacity ("RFC") for light work. (Tr. 26). Specifically, the ALJ found Plaintiff could "frequently reach above shoulder level and perform tasks requiring constant repetitive pushing and pulling." Id. The ALJ found Plaintiff had "an occasional limitation for concentrating on tasks assigned and coping with work stress, but she was capable of performing routine repetitive tasks." Id. Fourth, based upon Plaintiff's RFC, the ALJ found Plaintiff could not perform her past relevant work. (Tr. 42). However, relying on the testimony of a vocational expert ("VE"),

---

[6]There was some testimony that Plaintiff worked as a telemarketer after the onset of the her disability, but the ALJ found this was not substantial gainful activity. (Tr. 22).

[7]Plaintiff claimed she also suffered from Hasimoto thyroiditis, chronic bronchitis, anxiety with panic attacks, IBS, obesity, and migraines, but the ALJ found these symptoms were not severe. (Tr. 22-25).

the ALJ found Plaintiff could adjust to work as an usher/ticket taker, a fast food worker, or a cashier, all of which are available locally in significant numbers. (Tr. 43). Accordingly, the ALJ found Plaintiff was not disabled at any time through the date of his decision and denied Plaintiff's claim for benefits. (Tr. 44).

## III. ANALYSIS

### A. The Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds the evidence preponderates against the Commissioner's decision. Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th

Cir. 1992) (the court must scrutinize the entire record to determine reasonableness of factual findings).

**B.    Issues on Appeal**

Plaintiff argues the following three issues on appeal: (1) the ALJ erred by concluding Plaintiff's spine condition did not meet impairment listing 1.04, (2) the ALJ failed to afford full credibility to Plaintiff's testimony, and (3) the ALJ failed to accord controlling weight to the opinions of Plaintiff's treating physicians.  (Doc. 15, p. 16).  The Court will address each of the issues raised by Plaintiff.

**1.    Whether the ALJ erred in finding Plaintiff's impairments did not meet the criteria for disability under impairment Listing 1.04**

As noted above, there is a five-step process to determine whether an adult claimant is disabled. Sullivan v. Zebley, 493 U.S. 521, 525 (1990).  The third-step of this process requires the ALJ to compare the claimant's medical evidence to a list of impairments "presumed severe enough to preclude any gainful work."  Id.  If the medical evidence meets or equals the listing, then a finding of disability is made.  Id.  The ALJ does not need to "mechanically recite the evidence" leading to his determination that a claimant's impairments do not meet the listing criteria.  Hutchinson v. Bowen, 787 F.2d 1462, 1463 (11th Cir. 1986).  In other words, the ALJ's listing determination need not be explicitly stated but may be found implicitly in the ALJ's decision, if he goes on to the fourth and fifth steps of the disability analysis.  Id.

 At the third step of the evaluation process, the burden is on the claimant to prove that she is disabled.  Bell v. Bowen, 796 F.2d 1350, 1352 (11th Cir. 1986)(citing 20 C.F.R. §§ 404.1525, 404.1526); Wilkinson v. Bowen, 847 F.2d 660, 663 (11th Cir. 1987).  In

order to meet a listing, the claimant must show she has been (1) diagnosed with a condition included in the listings and (2) present specific medical findings that meet the various tests listed under the description of the applicable impairment. Bell, 796 F.2d at 1353. A diagnosis alone is insufficient. 20 C.F.R. § 416.925(c)-(d). In order to equal a listing, the medical findings [should] be at least equal in severity and duration to the listed findings." Wilkinson, 847 F.2d at 662 (11th Cir. 1987). However, if a claimant has been diagnosed with a condition described in the listings, but is unable to provide medical evidence that meet all of the criteria, she may still qualify for the particular listing if she is able to proffer other evidence that is equal in medical significance to the listed criteria. 20 C.F.R. § 404.1526(b)(1)(i)(B).

In this case, Plaintiff was diagnosed with DDD which is an impairment of the spine. Therefore, it was Plaintiff's burden to establish presumptive disability under Listing 1.04. Listing 1.04 provides:

> *Disorders of the spine* . . . resulting in compromise of a nerve root . . . or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable

18

> imaging, manifested by chronic nonradicular pain and
> weakness, and resulting in inability to ambulate effectively, as
> defined in 1.00B2b.

20 C.F.R. pt. 404, subpt. P, App. 1, § 1.04.  Plaintiff's medical evidence does not offer

proof of spinal arachnoiditis as specified in section B, or lumbar spinal stenosis as

specified in section B.  As such, in order to meet listing 1.04, Plaintiff needed to provide

medical evidence reflecting (1) Nerve root compression characterized by neuro-anatomic

distribution of pain, (2) limitation of motion of the spine and motor loss accompanied by

sensory or reflex loss.  In this case, the positive straight-leg raising test is not relevant

because Plaintiff's lower back was not involved.[8]

Here, although the ALJ determined Plaintiff's DDD was a severe impairment, he

found it did not meet or equal in severity the criteria of Listing 1.04.  Plaintiff argues the

ALJ failed to properly address and analyze evidence that proved Plaintiff's condition

actually met Listing 1.04.  (Doc. 15, p. 11).  Specifically, Plaintiff contends the ALJ did

not provide a step-by-step analysis of the reasons he rejected evidence that clearly

pointed to Listing 1.04.  (Doc. 15, p. 12).  It appears Plaintiff is referring to her testimony

regarding pain, limitation of motion, muscle weakness, and sensory or reflex loss.  See

(Doc. 15, p. 10).  On the other hand, the Commissioner contends Plaintiff failed to meet

her burden of proving her impairments met or equaled Listing 1.04.  (Doc. 16, p. 9).

Specifically, the Commissioner argues substantial evidence supports the ALJ's finding

that Plaintiff did not meet Listing 1.04 because the medical evidence does not prove

Plaintiff's impairments met *all* of the criteria in subsection A of Listing 1.04 for a

---

[8]Plaintiff's lower back is not involved because her disc herniation is in the cervical spine.

consecutive period of at least twelve months. (Doc. 16, p. 9). Furthermore, the Commissioner argues although Plaintiff claimed the evidence "clearly points toward Listing 1.04," she did not cite to any medical evidence to support her claim. (Doc. 16, p. 7).

The Court agrees with the Commissioner and finds Plaintiff did not satisfy her burden of proving her DDD met or medically equaled Listing 1.04. Plaintiff provided medical evidence that showed she suffered from DDD with nerve root impingement, but Plaintiff did not sufficiently demonstrate that she had limited motion of her spine, together with motor loss and sensory or reflex loss. On December 20, 1999, Plaintiff was diagnosed with a large extruded disc herniation at C6-7 encroaching on the nerve root. (Tr. 300). On May 7, 2001, an MRI of the spine indicated Plaintiff had degenerative disc change at C6-7, mild disc degeneration at C2-3, C3-4, C-4-5, and C5-6, as well as left C6-7 foraminal impingement. (Tr. 308). An MRI performed January 20, 2004, showed foraminal impingement at the left side of C6-7. (Tr. 617). Accordingly, Plaintiff was able to provide evidence of a disorder of the spine with nerve compression. However, as previously noted, to satisfy the Listing 1.04 requirements Plaintiff also needed to provide evidence of limited motion of her spine and some motor loss (atrophy with associated muscle weakness or muscle weakness) together with sensory or reflex loss.

On September 20, 1999, Dr. Mirabello noted Plaintiff had no muscle atrophy or pain with extension of the cervical spine. (Tr. 301). Dr. Bender's initial evaluation indicated Plaintiff had normal range of motion in her left shoulder, although there were signs of *mild* impingement. (Tr. 323). On February 29, 2000, Dr. Schwartz noted Plaintiff's "cervical range of motion was *slightly* decreased in lateral rotation to the [left]."

(Tr. 355).  Dr. Schwartz's examination also revealed Plaintiff had full strength and sensation in her upper right and lower extremities.  (Tr. 355).  However, there was some *mild* weakness in Plaintiff's upper left extremity.  Id.  Dr. Schwartz performed another physical exam on July 9, 2001, which revealed Plaintiff had decreased bilateral rotation of the cervical spine.  (Tr. 342).  However, Dr. Schwartz found Plaintiff's reflexes and the strength in her extremities were normal.  (Tr. 342).  On July 9, 2002, Dr. Schwartz noted the examination of Plaintiff's "cervical spine revealed decreased cervical range of motion in all ranges," but once more, Plaintiff had normal strength and reflexes in her extremities.  (Tr. 472).

On June 19, 2003, Dr. Horton examined Plaintiff and found she had full range of motion in her cervical and thoracodorsal spine.  (Tr. 544).  Dr. Horton noted Plaintiff's muscle strength was normal.  Id.  On November 20, 2003, Dr. Horton once again found Plaintiff had full range of motion of the cervical and thoracodorsal spine.  (Tr. 542).  He also observed the strength in Plaintiff's extremities as well as her reflexes were normal. Id.  Dr. Horton examined Plaintiff on January 27, 2004.  Id.  Again, Dr. Horton determined Plaintiff had good range of motion in her spine.  (Tr. 626).  He also found Plaintiff's reflexes and muscular power in all four extremities were normal.  Id.  Finally, in an evaluation performed on March 15, 2004, Dr. Freeman noted Plaintiff's range of motion was 5 degrees to the right and 10 degrees to the left.  (Tr. 616).  In addition, Dr. Freeman observed Plaintiff could rotate her neck 45 degrees in both directions when distracted.  Id.

The Court finds while the medical evidence suggests Plaintiff had reduced motion in her spine, it does not indicate Plaintiff suffered motor loss (atrophy with associated

muscle weakness or muscle weakness) accompanied by sensory or reflex loss. On the contrary, as the Commissioner points out, several of Plaintiff's doctors noted Plaintiff had no atrophy or reduction in muscle strength. (Doc. 16, pp. 7-9). The Court finds while Plaintiff argues the ALJ overlooked her *testimony* regarding her pain, limitation of motion, muscle weakness, and sensory or reflex loss, Plaintiff does not point to any specific testimonial evidence that is of equal medical significance to the required criteria. Furthermore, Plaintiff does not cite to, nor does the Court find any medical evidence in the record that equates to the severity and duration specified in Listing 1.04. Accordingly, the Court concludes the ALJ did not err in his analysis of the impairment listing.[9] The Court finds substantial evidence supports the ALJ's finding that Plaintiff's DDD did not *meet* or equal in severity the criteria of Listing 1.04.

## 2. Whether the ALJ erred in his evaluation of Plaintiff's subjective complaints

It is the role of the ALJ to make credibility findings as to a claimant's testimony. Ryan v. Heckler, 762 F.2d 939, 942 (11th Cir. 1985). Pain is a non-exertional impairment. Foote, 67 F.3d at 1559. Therefore, the ALJ must consider *all* of a claimant's statements about her symptoms, including pain, in determining the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528 (emphasis added). In determining whether the medical signs and laboratory findings show medical impairments which could reasonably be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's

_____

[9]To the extent Plaintiff argues the ALJ failed to provide a detailed analysis before concluding Plaintiff did not meet the impairment listing, the Court finds there is no requirement that the ALJ provide a step-by-step analysis of his Listing determination. See Hutchinson, 787 F.2d at 1463.

three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Foote, 67 F.3d at 1560 (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)). Pain alone can be disabling, even when its existence is unsupported by objective evidence, Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

When the ALJ decides not to credit a claimant's testimony about pain, he must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  Jones v. Dep't of Health & Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991)(stated reasons must be based on substantial evidence); See also Moore v. Barnhart, 405 F.3d 1208, 1212 n.4 (11th Cir. 2005)(holding precedent in the Eleventh Circuit requires "explicit articulation of the reasons justifying a decision to discredit a claimant's subjective pain testimony").  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  Foote, 67 F.3d at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

In this case, the ALJ provided a detailed review of the record evidence and determined Plaintiff's impairments could reasonably be expected to produce the symptoms alleged. However, the ALJ found Plaintiff's statements about the intensity, duration, and limiting effects of her symptoms were "not entirely credible." (Tr. 38). The ALJ reasoned although Plaintiff claimed disabling pain, numerous inconsistencies in the record undermined her allegations.

First, with regard to alleged symptoms of anxiety and panic attacks, the ALJ noted that even though Plaintiff indicated she was unable to take the elevator to the hearing room for fear that she might have a panic attack, she chose to walk alone and unassisted up an enclosed stairwell.[10] (Tr. 476). Further, the ALJ highlighted the fact that Plaintiff did not express any difficulty with getting to the hearing room for the subsequent hearings, despite the fact that each one was held on the second floor of the building. (Tr. 26). Also, with respect to the alleged panic attacks, the ALJ noted the discrepancies in Plaintiff's reports to her treating sources. Specifically, the ALJ pointed out that in February 2002, Plaintiff told Dr. Dies she had gotten more control of her panic attacks recently, but on October 31, 2003, Plaintiff reported to Dr. Cua that although she had experienced panic attacks since age 16, they had worsened since her accident in 1999. (Tr. 462, 581). Additionally, the ALJ noted despite Plaintiff's testimony about panic attacks since age 16, Plaintiff did not mention these symptoms to Dr. Kanakis during her consultative evaluation on February 1, 2002. (Tr. 358-360). Furthermore,

---

[10]The ALJ also included the hearing monitor's observations of Plaintiff before the initial hearing. The hearing monitor reported Plaintiff sat quietly before while she waited for her attorney, but began to exhibit pain behaviors, walking bent over and crying, only after her attorney arrived.

the ALJ found there was no objective evidence of panic attacks and no prescribed treatment for the same in the record.[11]

Second, the ALJ discredited Plaintiff's testimony due to evidence of her symptom magnification. The ALJ highlighted the fact that Dr. Delbeato, the consultative psychologist who administered the MMPI-2 on February 18, 2004, found the results of the test "revealed primarily exaggeration and embellishment of [Plaintiff's] symptoms." (Tr. 42). Dr. DelBeato invalidated the results, indicating Plaintiff's symptoms were more related to narcissistic personality features than a depressive illness. (Tr. 585). Dr. DelBeato found Plaintiff was obsessed with her symptoms and displayed a "chip on the shoulder" type of attitude. Id. The ALJ further found the testimony of medical expert, Dr. Kazar, supported the assessment that Plaintiff was exaggerating her symptoms. (Tr. 27). Specifically, Dr. Kazar indicated Plaintiff's elevated scores on the lie scale of the MMPI-2 suggested Plaintiff may have been exaggerating her symptoms. (Tr. 909). Other evidence of symptom magnification which the ALJ noted was that Plaintiff's complaints of excruciating pain during her FCE, were inconsistent with her ability to exercise and with her heart rate.[12] (Tr. 38). The ALJ also highlighted the fact that Dr. Freeman noted Plaintiff's ROM was minimal upon examination, but Dr. Freeman observed Plaintiff could rotate her neck 45 degrees to either side when distracted. (Tr.

---

[11]The ALJ also noted inconsistencies in her complaints to treating sources about headaches and excessive weight gain. (Tr. 24, 25).

[12]Plaintiff complained of "excruciating" pain with activities such as sitting, standing, walking, climbing stairs, bending squatting, kneeling, crawling, reaching, pivotting, twisting, pushing, and pulling, but the therapist noted Plaintiff's heart rate remained in the range of 74-77 which was inconsistent with the 10 beats per minute increase expected with the level of alleged pain. (Tr. 29).

617).  Additionally, the ALJ noted while Dr. Soto-Aguilar also diagnosed Plaintiff with fibromyalgia, she only added wrist splints to Plaintiff's treatment, she encouraged low impact exercise, and she did not restrict Plaintiff's activities.  (Tr. 36).  The ALJ pointed out that despite Plaintiff's complaints of new and pre-existing pain at her November 2005 visit with Dr. Soto-Aguilar, Plaintiff told the doctor she was able to drive her husband to and from work four out of five days per week.  Id.  The ALJ found Plaintiff's reports to Dr. Soto-Aguilar and the doctor's recommendations regarding treatment were inconsistent with Plaintiff's allegations of disabling pain.

Finally, the ALJ found Plaintiff's allegations of disabling symptoms were inconsistent with gaps in Plaintiff's doctor visits, Plaintiff's failure to use of prescribed medication, and her courtship and marriage, after the alleged date of onset.  He also seems to have discredited Plaintiff's testimony based on the fact that she repeatedly refused ACDF surgery and only received conservative treatment for her cervical spine injury.  (Tr. 28, 40, 42).

Plaintiff argues the ALJ erred by making an "improper, blanket credibility finding" and not properly evaluating Plaintiff's subjective complaints according to the SSR 96-7p factors.  (Doc. 15, p. 12).  Plaintiff also contends the ALJ failed to identify what weight he attributed to the individual, disabling conditions testified to by Plaintiff and failed to indicate his reasons for finding Plaintiff's complaints less than credible.  (Doc. 15, p. 13).  Plaintiff argues the ALJ never stated what it was about Plaintiff that led him to believe her statements were less than credible.  Id.

The Commissioner argues substantial evidence supports the ALJ's credibility

finding because Plaintiff's treatment records and her daily activities do not establish that her condition caused disabling limitations.  (Doc. 16, p. 11).  Furthermore, the Commissioner argues, the ALJ thoroughly discussed the medical evidence when assessing Plaintiff's testimony and is not required to specifically refer to each and every one of Plaintiff's allegations.  (Doc. 16, 12).  Finally, the Commissioner points out while Plaintiff states her "subjective complaints of pain are supported by the objective medical evidence," she does not cite to any specific findings that support her allegations.  <u>Id.</u>

The Court must determine whether the reasons the ALJ articulated for discrediting Plaintiff's testimony are adequate and supported by substantial evidence.  <u>MacGregor</u>, 786 F.2d at 1054.  In discrediting a claimant's pain testimony, the ALJ is required to consider the factors outlined in SSR 96-7p.  The purpose of the SSR 96-7p factors is to assist the ALJ in developing the record and considering all available information that might shed light on the credibility of a claimant's statements.  SSR 96-7p. 1996 WL 374186, at *3 (July 2, 1996); <u>See</u> <u>Walker v. Comm'r of Soc. Sec</u>., No. 6:07-cv-1647-Orl-18KRS, 2008 WL 5100120, at *6 (M.D. Fla. Dec. 2, 2008).  However, there is no requirement that the ALJ explicitly discuss each of the seven factors.  <u>See</u> <u>French v. Massanari</u>, 152 F. Supp. 2d 1329, 1338, n.6 (M.D. Fla. 2001) (holding "it is not reversible error that the administrative law judge did not expressly mention the side effects of [the plaintiff's] medications in his credibility determination"); <u>Bechtold v. Massanari</u>, 152 F. Supp. 2d 1340, 1349, n.9 (M.D. Fla. 2001), <u>aff'd</u>, 31 Fed. Appx. 202 (11th Cir. 2001)("In the Eleventh Circuit, there is no requirement that all seven of these factors be discussed explicitly.").  Nevertheless, the ALJ's credibility finding cannot be a "broad rejection." <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005).  Therefore, in determining the

credibility of a claimant's statements, the ALJ must consider the entire case record and articulate his findings so as to "make clear to the individual and to any subsequent reviewers, the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. 1996 WL 374186, at *1 (July 2, 1996); See Harris v. Astrue, No. 07-22334-CIV, 2008 WL 4725194, at *6 (S.D. Fla. Oct. 24, 2008)(affirming clearly articulated credibility finding based on clinical data, testimony, demeanor at the hearing, medications, daily activities, and motivations).

There is no requirement that the ALJ detail his evaluation of the SSR 96-7p factors. However, when the ALJ decides not to credit a claimant's testimony about pain, he is required to either articulate specific and adequate reasons for doing so or the reasons for the ALJ's credibility finding must be obvious from the record. Jones, 941 F.2d at 1532. The ALJ is allowed to consider the inconsistencies between a claimant's subjective complaints and the evidence of record. See MaCray v. Massanari, 175 F. Supp. 2d 1329, 1338 (M.D.Ala. 2001)(holding the ALJ is entitled to consider inconsistencies between claimant's subjective complaints and evidence of record). On this record, the Court finds the ALJ provided sufficient reason for discrediting Plaintiff's testimony by pointing out several conflicts between Plaintiff's behaviors and her reports to treating physicians and her subjective complaints. See Ballasso v. Astrue, No. 5:07cv239-SPM/WCS, 2008 WL 3540272, at *9 (N.D.Fla. Aug. 12, 2008)(finding substantial evidence where the ALJ determined the record was "peppered with inconsistencies . . ." and evidence of such inconsistencies reflected poorly on claimant's

overall credibility).  While any one of the ALJ's reasons[13], by itself, might not constitute

substantial evidence, the Court finds the pervasiveness of the inconsistencies in the

instant record dictate that the ALJ's credibility finding be affirmed.  See Posey v. Astrue,

3:07cv556/MCR/EMT, 2008 WL 4187003, at *16 (N.D.Fla. Sept. 5, 2008)(finding the

totality of inconsistencies highlighted in the ALJ's decision amounted to substantial

evidence though any one of the discrepancies would not have been enough).

### 3.    Whether the ALJ erred by failing to accord controlling weight to the opinions of Plaintiff's treating physicians

The ALJ is required to give controlling weight to the opinion of a treating physician

because a treating physician is one who is able to provide a detailed longitudinal picture

of the claimant's impairment(s). 20 C.F.R. § 404.1527(d)(2).   A treating physician's

opinion must be given "substantial or considerable weight unless 'good cause' is shown

to the contrary."  Wright v. Barnhart, 153 Fed. Appx. 678, 684 (11th Cir. 2005)(citing

Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997)).  The Eleventh Circuit has found

there is "good cause" to place less weight on the opinion of a treating physician where:

(1) the opinion was not bolstered by the evidence, (2) the evidence supported a contrary

finding, or (3) the opinion was conclusory or inconsistent with the doctor's own medical

records.  Id.  Where an ALJ discounts or rejects a treating physician's opinion, she is

required to articulate her reasons for doing so.  Phillips v. Barnhart, 357 F.3d. 1232,

1241 (11th Cir. 2004).  An ALJ commits reversible error if she fails to articulate reasons

---

[13]For example, the Court finds the fact that Plaintiff met and married her husband after
her injury, by itself, would not be a sufficient reason to discredit her testimony.  The Eleventh
Circuit has found it is error to reject the severity of subjective complaints because a claimant got
married.  Hogart v. Sullivan, 733 F. Supp. 1465, 1469 (M.D. Fla. 1990)(stating the ability to
sustain family relationships does not equate to a capability to sustain gainful work where there
are debilitating impairments present).

for discounting a treating physician's opinion. See Lewis, 125 F.3d at 1440. Where an ALJ does not give a treating source's opinion controlling weight, the ALJ must still consider the following factors in determining the weight to give that opinion: the length, nature and extent of the treatment relationship, the frequency of examination, whether the opinion is supported by objective findings, whether the opinion is consistent with the record as a whole, and the specialization of the doctor. See 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (d)(3)-(6)(2008).

In this case, the ALJ completely discredited the opinion of Dr. Dies and placed limited weight on the opinions of Dr. Levine and Dr. Cua. (Tr. 38, 39, 40, 41). The ALJ determined the opinions of Drs. Levine, Dies, and Cua were based primarily on Plaintiff's subjective complaints. (Tr. 38, 42). The ALJ found Dr. Levine's opinion was inconsistent with his own medical records and the objective findings of the other medical sources and found Dr. Dies' opinion could not be relied on as an objective assessment. (Tr. 39-40). On the other hand, the ALJ placed great weight on the opinions of Dr. Schwartz and the state agency medical personnel because he found they were consistent with the objective medical evidence and claimant's activities. (Tr. 38, 42).

Plaintiff argues the ALJ erred by improperly relying on the reports of non-examining and consultative physicians, which were contrary to the diagnoses of Plaintiff's treating physicians and unsupported by objective medical findings. (Doc. 15, p. 16). Plaintiff also contends the ALJ "arbitrarily substituted his own opinion for those of the medical professionals." (Doc. 15, p. 17).

The Commissioner argues although Plaintiff contends the ALJ failed to give

controlling weight to her treating physicians, Plaintiff does not identify specific opinions which the ALJ should have given controlling weight. (Doc. 16, p. 12). Rather, the Commissioner argues, Plaintiff merely recites the diagnoses made by Plaintiff's various medical sources. Id. The Commissioner contends the ALJ properly considered the opinions of Plaintiff's treating, examining, and non-examining doctors. (Doc. 16, pp. 13, 14).

The regulations indicate a treating physician's opinion can be discounted where the ALJ establishes good cause for doing so. As previously noted, good cause is found where a treating source's opinion is not bolstered by the evidence, is inconsistent with the doctor's own records, or where the weight of the evidence supports a contrary finding. Phillips, 357 F.3d at 1232. Generally, the opinion of a non-examining physician is not entitled to substantial weight if it contradicts that of an examining physician. Lamb, 847 F.2d at 703. However, where a non-examining physician's report does not directly contradict an examining physician's opinion, the ALJ does not err in relying on the non-examining physician's report, so long as there is additional evidence to support that report. 20 C.F.R. § 404.1527(d)(3) - (4); See Edwards, 937 F.2d at 584-85. By itself, a non-examining doctor's opinion does not constitute substantial evidence. Kemp v. Astrue, No. 08-12805, 2009 WL 163019, at *4 (11th Cir. 2009) (citing Lamb, 847 F.2d at 703).

Turning now to the ALJ's treatment of Dr. Levine's reports, the ALJ gave little weight to Dr. Levine's assessments because he found they were based solely on Plaintiff's subjective complaints. (Tr. 38). The ALJ determined Dr. Levine's opinion that Plaintiff was unable to work due to numerous health problems was entitled to little weight

31

because it was inconsistent with Dr. Levine's own records and with the objective clinical evidence from all other treating and consulting doctors. (Tr. 39). The ALJ also gave limited weight to Dr. Levine's mental assessments of Plaintiff because Dr. Levine is not a mental health care provider and because he found them "inconsistent with the objective clinical findings and claimant's daily activities." (Tr. 42).

The Court finds while it is not explicitly stated in his decision, the ALJ adequately considered the factors outlined in 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (d)(3)-(6)(2008) and there was good cause to place limited weight on the assessments of Dr. Levine. The Court concludes the ALJ's treatment of Dr. Levine's assessments is supported by substantial evidence. First, in terms of Dr. Levine's physical assessments, Dr. Levine saw Plaintiff for the first time on April 30, 2002 and completed a physical RFC in which he indicated Plaintiff could occasionally and frequently lift less than 10 lbs., stand and/or walk with normal breaks less than 2 hours in an 8-hour workday, and sit, with normal breaks, for a total of less than 6 hours in an 8-hour workday. (Tr. 464). Dr. Levine indicated Plaintiff was limited in all four extremities and he found Plaintiff could never climb, but could occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 465). Dr. Levine also determined Plaintiff was limited in her ability to reach, handle, finger, and feel and she needed to avoid moderate exposure to cold and vibration, and concentrated exposure to extreme heat, wetness, humidity, noise, and fumes. (Tr. 468). It appears the ALJ reasoned the limitations stated by Dr. Levine were not entitled to full credibility because they were reported after only one visit, before Dr. Levine had an opportunity to conduct any objective tests, or order lab work. Accordingly, the ALJ found Dr. Levine's physical RFC assessments were based primarily on Plaintiff's subjective complaints.

32

The Court finds the ALJ did not err in discrediting Dr. Levine's opinion. See Freeman v. Barnhart, 220 Fed. Appx. 957 (11th Cir. 2007)(noting an opinion that appears to be based primarily on the claimant's subjective complaints is a factor that weighs in favor of discounting a treating physician's opinion).

Second, the ALJ noted after Plaintiff's first visit on April 30, 2002, Dr. Levine's only impression was that Plaintiff had CTS and some disc herniation. (Tr. 432). Then, in a letter dated June 23, 2005, Dr. Levine opined Plaintiff was unable to work due to her numerous health problems including, fibromyalgia, hypothyrodism, anxiety, depression, degenerative disc disease of the cervical spine, degenerative disc of the lumbar spine, bilateral CTS, migraines, and obesity. (Tr. 725). However, on March 6, 2006, Dr. Levine signed a statement indicating Plaintiff's physical limitations had remained the same from April 2002 to that time. (Tr. 783). The ALJ found Dr. Levine's opinion letter and signed statement inconsistent with his records. Again, the Court finds the record supports the ALJ's finding.

Third, the ALJ found Dr. Levine's physical RFC was inconsistent with the objective findings of the other treating doctors. Specifically, the ALJ noted rheumatologist, Dr. Soto-Aguilar, added muscle relaxant and anti-inflammatory medications to Plaintiff's treatment regimen on November 22, 2005, but advised Plaintiff to exercise and did not restrict her activities. (Tr. 770). The ALJ also noted Plaintiff was not as restricted as Dr. Levine opined because Plaintiff told Dr. Soto-Aguilar she drove her husband to and from work four out of five days, despite her complaints of significant pre-existing pain and reports of a new injury. Id. The ALJ pointed out that Dr. Schwartz decreased Plaintiff's impairment rating from 13% to 5% on January 17, 2002, after reviewing Plaintiff's MRIs

33

and the results of her Functional Capacity Evaluation. (Tr. 339). At that time, Dr. Schwartz found Plaintiff was capable of lifting 10 lbs. and was limited in her bilateral overhead activities, but was able to work four hours per day, five days per week. Id. Further, all Dr. Schwartz prescribed was Ultracet for pain as needed. Id. Additionally, the ALJ noted Dr. Levine's assessments of Plaintiff's condition conflicted with the physical RFC assessments completed by state agency personnel, all of which concurred and bolstered Dr. Schwartz's opinion that Plaintiff was capable of light work. (Tr. 375, 384, 396, 471).

In terms of Dr. Levine's mental assessments, Dr. Levine completed a mental RFC for Plaintiff on April 20, 2006, indicating Plaintiff's mental limitations dated back to 2002. (Tr. 784). Dr. Levine opined Plaintiff had significant signs and symptoms of depression, increasingly severe panic attacks, and anxiety. (Tr. 786). He noted Plaintiff had problems with short term memory loss and was unable to stay on task, focus, and concentrate. Id. Dr. Levine's mental restrictions appear to be based solely on the fact that he knew the Plaintiff from April 2002. Id. There is no evidence Dr. Levine administered a psychological assessment instrument and his treatment records contain no reference to the limitations he reported.

The earliest recorded complaint of depression by Plaintiff is dated December 23, 2002. (Tr. 410). While Dr. Levine's treatment notes indicate he prescribed Zoloft as early as May 7, 2002, it is not clear Zoloft was prescribed to treat depression. (Tr. 430). Medical expert, Dr. Kazar, indicated Zoloft and other antidepressants are sometimes used to alleviate pain and not to treat depression. (Tr. 922). Furthermore, there was no evidence Dr. Levine restricted Plaintiff due to depression at any time prior to her date of

last insured and Dr. Levine, Plaintiff's primary care doctor, did not refer Plaintiff to a mental health specialist for an evaluation of depression until October 31, 2003. (Tr. 581).

Dr. Levine first noted anxiety in Plaintiff on February 25, 2003, subsequent to Plaintiff's date of last insured, and Dr. Levine did not, at any time, prescribe medication or recommend treatment for anxiety. (Tr. 530). While Plaintiff's other doctors consistently reported symptoms of depression, neither Dr. Levine or any of Plaintiff's other treating sources, recorded objective evidence of anxiety disorder. Nevertheless, Dr. Levine opined Plaintiff was unable to work due to anxiety disorder. (Tr. 725). Substantial evidence supports the ALJ's decision to place limited weight on Dr. Levine's assessments of Plaintiff's condition. Upon review, the Court finds the ALJ properly discredited Dr. Levine's opinion.

With regard to Dr. Cua's opinion, the ALJ found it was based solely on Plaintiff's subjective complaints. (Tr. 23). Similar to Dr. Levine, Dr. Cua completed a mental RFC assessment on the date of Plaintiff's initial visit, October 15, 2003, and later signed a statement on March 24, 2006, indicating Plaintiff's condition had not changed. (Tr. 782). After Plaintiff's initial visit, Dr. Cua opined Plaintiff's depression met the listing criteria of Section 12.04 and determined Plaintiff had marked limitation in her ability to interact with the general public and respond appropriately to the changes of the work environment. Id. However, there is no evidence that at that time Dr. Cua had been able to adequately observe Plaintiff. Further, there is no evidence Dr. Cua ever administered to Plaintiff an objective psychological assessment instrument. As such, the ALJ found no objective basis for Dr. Cua's opinion of Plaintiff's limitations. (Tr. 581). The Court finds the record

35

supports the ALJ's finding that Dr. Cua's opinion was based on Plaintiff's subjective complaints.

Additionally, while the following issue was not argued by the parties, the Court finds the ALJ had good cause to limit the weight placed on Dr. Cua's opinion because Dr. Cua's opinion did not concern Plaintiff's condition prior to her date last insured. Dr. Cua treated Plaintiff from October 15, 2003 through August 24, 2005. (Tr. 581, 726). The ALJ noted Plaintiff's insured status for Title II benefits expired on September 30, 2002. (Tr. 31). As such, Plaintiff was required to establish disability prior to that date. Although the ALJ is required to consider evidence post-dating Plaintiff''s date last insured, it should only be to the extent that such evidence bears on Plaintiff's impairments before the expiration of her insured status. 20 C.F.R. § 404.130(b); <u>See Goff v. Comm'r of Soc. Sec.</u>, 253 Fed. Appx. 918, 921 (11th Cir. 2007); <u>Ward v. Astrue</u>, No. 3:00-CV-1137-J-HTS, 2008 WL 1994978, at *4 (M.D.Fla. May 8, 2008)(citing <u>Cooper v. Comm'r of Soc. Sec.</u>, 277 F. Supp. 2d 748, 754 (E.D.Mich. 2003). Accordingly, the Court finds because Dr. Cua's opinion does not reflect an assessment of Plaintiff's condition prior to September 30, 2002, in addition to the fact that the opinion was not bolstered by objective findings, the ALJ properly limited the weight he placed on Dr. Cua's opinion.

Finally, the ALJ found Dr. Dies's report unreliable due to the fact that Plaintiff was referred to Dr. Dies by her attorney and Dr. Dies had a pecuniary interest in the outcome of Plaintiff's case. (Tr. 29). Specifically, the ALJ noted the initial documentation which Dr. Dies presented to Plaintiff stated her participation in the psychotherapy sessions were intended to improve her chances at winning benefits. (Tr. 475). Further, the initial

36

paperwork allowed Plaintiff the option of paying for the sessions from her Social Security Administration Award.  Id.  The Court finds the ALJ's reasons for completely discrediting Dr. Dies's report are reasonable and supported by substantial evidence in the record. Overall, the Court concludes there is substantial evidence supporting the ALJ's decision to discredit the opinions of Plaintiff's treating physicians.

## IV. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk is directed to enter judgment consistent with this opinion and thereafter, to close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 30th day of March, 2009.

_Monte C. Richardson_

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:
Counsel of Record